UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
IN ADMIRALTY

CASE NO. 23-20014-CIV-ALTONAGA/Damian

**PAN OCEAN CO., LTD.**,

    Plaintiff,

v.

**WORLD FUEL SERVICES (SINGAPORE) PTE, LTD.**,

    Defendant.

_____/

**PLAINTIFF'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

Plaintiff, Pan Ocean Co., LTD. ("Pan Ocean"), submits the following Proposed Findings of Fact and Conclusions of Law:

**CLAIMS PRESENTED**

This matter involves a breach of a maritime contract for fuel oil. Pan Ocean, the time charterer of the M/V African Wren ("African Wren" or "Vessel"), contracted with WORLD FUEL SERVICES (SINGAPORE) PTE, LTD. ("WFS") for Very Low Sulfur Fuel Oil ("VLSFO" or "Bunkers") to be delivered to the Vessel in Singapore. The fuel that WFS supplied did not meet the specifications required by the contract. As a result, Pan Ocean filed this action against WFS for breach of contract.

**FINDINGS OF FACT**

From the testimony and documents received into evidence at trial, it has been established that:

    1.    Pan Ocean is a global shipping company with more than two thousand employees that has been in business since 1966.

2. Pan Ocean currently orders fuel oil from ten suppliers and operates approximately 300 commercial ships. It owns approximately 20 ships similar in size to the African Wren.

3. Pan Ocean and WFS have a longstanding business relationship. Between October 2021 and October 2023, Pan Ocean purchased marine fuel oil from WFS 586 times, including after the filing of this lawsuit, and Pan Ocean continues to buy fuel oil from WFS.

4. Pan Ocean time chartered the African Wren from its disponent owner MUR Shipping BV ("MUR"), pursuant to a New York Produce Exchange time Charter Party ("Charter Party").

5. The Charter Party required that "**whilst on hire** the Charterers shall provide and pay for all the fuel except as otherwise agreed."

6. The Charter Party required that all Bunkers provided by Pan Ocean "conform with international intermediate fuel oil ISO 8217-2010(E), class RMG 380 for IFO."

7. Nowhere in the Charter Party did MUR authorize Pan Ocean to act as its agent for the purchase of the fuel. Rather, the Charter Party stated that Pan Ocean "shall supply bunkers or a quality suitable for burning in the Vessel's engines and auxiliaries and which conform to the specification(s) mutually agreed under this Charter."

8. Pan Ocean and WFS had a Master Agreement (ECF 56-4) for the provision of bunkers that incorporated WFS general terms and conditions ("the Contract").

9. Pan Ocean asked WFS to provide a quotation for the purchase of the bunker fuel, and at the end of negotiation, and when the price was agreed, WFS provided a confirmation of the order.

10. On July 5, 2022, Pan Ocean received a confirmation for the purchased bunkers, identifying the fuel ordered by Pan Ocean to be 500 metric tons of Very Low Sulfur Fuel Oil (VLSFO) with specification "ISO 8217: 2010 RMG 380 max .5 percent."

11. On July 9, 2022, WFS had bunker supplier BP Singapore Pte Limited deliver 498.733 metric tons of fuel to the African Wren.

12. WFS sent an invoice for the fuel to Pan Ocean, and Pan Ocean paid this invoice in full.

13. For the specifications of the bunkers, paragraphs 4 of the Contract provides that "[t]he quantity of Products sold in each Transaction shall be as agreed between [Pan Ocean] and [WFS] in the Confirmation" and paragraph 3 provides "[u]nless otherwise specified in the Confirmation, the Products shall be of the quality generally offered by [WFS] at the time and place of delivery, for the particular grade or grades ordered by [Pan Ocean]".

14. During the delivery of the bunker fuel, MUR took samples and had them tested by non-party Veritas Petroleum Services BV (**"VPS"**). The VPS test of the fuel oil found that the fuel oil contained 1.40 %V/V of water and 112 mg/kg of sodium, exceeding the 0.50% and 100mg/kg maximum specifications for water and sodium, respectively, in ISO 8217:20010 RMG380.

15. These test results showed that the fuel was off specification with excessive water and sodium.

16. On July 15, 2022, Kw Han, a senior manager from Pan Ocean, advised Ryan Kim, WFS' bunker supply agent, that the bunker supplied on July 9, 2022 did not meet the specifications in the confirmation of ISO 8217:2010 and relayed MUR's request that WFS also test the bunkers. The July 15 email further stated that "without prejudice. . . Pan Ocean reserve[ed] the right to make

a claim against World Fuel Services for the amount of a loss and all the consequences arising from the alleged off-spec bunker".

17. In response to this notice, Ryan Kim entered the claim into WFS' Felix system and emailed it to the claim management team the same day.

18. After receiving the notice, WFS advised BP, the fuel supplier, that the fuel was off-specification then requested that BP test the bunkers.

19. BP had its sample of the fuel oil tested for water and sodium by Inspectorate (Singapore) Pts Ltd ("Inspectorate").

20. The Inspectorate test confirmed that the VLSFO supplied did not meet the required specification for water and sodium.

21. Following this second test, BP advised WFS that the bunkers supplied to the African Wren were off-spec.

22. BP refused to conduct any further testing or to test any parameters other than water and sodium.

23. VPS provided operations advice on how to treat the fuel prior to it being consumed by the African Wren's engine.

24. On August 16, 2022, BP wrote a letter to WFS claiming that the African Wren should still be able to burn the off-spec bunkers without damage to the vessel.

25. On August 17, 2022, WFS relayed this conclusion to Pan Ocean with the Inspectorate report, and recommendation that the African Wren burn the off-spec VLSFO by following the recommendations provided by VPS for treating the fuel prior to consumption, stating that it "encourage[d] you/MUR to burn this fuel and avoid a completely unnecessary debunking which will only lead to significant losses and wasted costs".

4

26.     Thereafter, Pan Ocean made several requests to the owner of the African Wren, MUR, to burn the bunkers, adopting the arguments provided by BP, and WFS in an attempt to persuade MU, the owner and operator of the Vessel, to burn the fuel oil.

27.     Treatment of fuel by transferring it to a heated settling tank and draining would only reduce water and sodium if the fuel hadn't formed an emulsion.

28.     An emulsion is the mixing of two liquids that do not ordinarily mix, such as water and oil.

29.     Since 2020, there have been increased cases of oil and water emulsifying in VLSFO due to the nature of the fuel oil.

30.     The fuel sampling done on the AFRICAN WREN indicated that oil and water had emulsified.  Fuel treatment using settling tanks would not have been effective to treat the fuel if it had emulsified. (Jaeger 75:15 – 77:13).

31.     To definitively determine if an emulsion had formed, further testing of fuel using gas chromatograpfy mass spectrometry was required.

32.     Under the ISO standard for fuel, detailed chemical analysis of bunker fuels is not practical or required.

33.      Rather, "ISO 8217:2010, which provided the specification for the fuel in this matter, provides that "it is . . . not practical to require detailed chemical analysis for each delivery of fuels beyond the requirements listed in [ISO 8217:2010]. Instead, it is required that a refinery, fuel terminal or any other supply facility, including supply barges and truck deliveries, have in place adequate quality assurance and management of change procedures to ensure that the resultant fuel is compliant with the requirements of Clause 5 of this International Standard with regard to the exclusion of deleterious materials."

34. Prior to the delivery of the fuel to the AFRICAN WREN, WFS did not take physical possession of the bunkers and did not perform any testing of the fuel to determine if it met the requirements of ISO 8217-2010(E).  (ECF No. 56-3 at 17:13-20:9).

35. Water in fuel causes a decrease in purifier efficiency which may prevent the required reduction of cat fines to a level that would not damage a vessel's machinery.

36. Ultimately, however, MUR refused to do so rather than damage the vessel's machinery, and demanded de-bunkering.

37. On August 26, 2022, Pan Ocean, through counsel, informed WFS of MUR's refusal to burn the off-specification bunkers and requested that WFS arrange for debunkering, to which WFS refused.

38. As a result, MUR arranged for the debunkering of the off-specification fuel in Malta at a loss for Pan Ocean.

39. WFS did not meet its burden of proving that the fuel oil delivered to the African was able to be consumed without damaging the Vessel or its machinery.

40. At all time Pan Ocean acted reasonably in attempting to persuade MUR to treat and consume the Bunker if it could do so without damaging the Vessel.

41. WFS' failure to provide on spec bunkers, pursuant to the terms of the Contract, resulted in Pan Ocean suffering the following damages:

   a. $407,023.60 being the difference between the sums received for the bunkers and the sums which would have been received by Pan Ocean for the bunkers had WFS supplied contractual VLSFO;

   b. $76,748.54 being the lost hire/expense incurred during the debunkering operation; and

    c.    $6,803.39 being disbursements incurred at Malta for the purposes of debunkering.

42.    Pan Ocean is entitled to pre-judgment interest to be calculated at the rate set by the State of Florida for judgments.

## **CONCLUSIONS OF LAW**

1.    This Court has admiralty jurisdiction pursuant to 28 U.S.C. § 1333.

2.    The Court has personal jurisdiction over the parties to this action.

3.    Venue is proper in this District.

4.    The general maritime law of the United States governs the interpretation of the parties' contract and the parties' dispute. In the event maritime law is silent on a disputed issue, the laws of the State of Florida apply.

5.    This breach of contract action concerns a maritime contract between Pan Ocean and WFS.

6.    MUR was not a party to the Contract.

7.    Because the subject claim for breach of contract is *in personam*, the Federal Maritime Lien Act, 46 U.S.C. §§ 31341–31343, does not apply.

8.    Under maritime law, an owner of a vessel and charterer of a vessel are separate entities with distinct roles and separate responsibilities under maritime law. "The time charterer's duties are different from the vessel owner's duties." Moore v. Phillips Petroleum Co., 912 F.2d 789, 792 (5th Cir. 1990). Specifically, "[p]ossession and control remain with the owner and the ship is operated by its regular crew, but the charterer determines the ship's routes and destinations." Kerr-McGee Corp. v. Ma-Ju Marine Servs., Inc., 830 F.2d 1332, 1340–41 (5th Cir. 1987).

9.    The Charter Party was subject to English law. Under English Law, a time charterer of a vessel lacks actual authority to bind the owner to a contract. The Yuta Bondarovskaya [1998]

7

2 Lloyd's Rep. 357 (holding "the idea that an owner who time chartered his vessel to a time charterer was authorizing the time charterer to contract on his behalf, was contrary both to the express terms and to the underlying basis of a time charter."). See Hayes v. WILH Wilhelmsen Enterprises LTD, 818 F2d 1557 (11th Cir 1987).

10. Pan Ocean did not have actual authority to bind MUR to the Contract because the Charter Party did not grant Pan Ocean this authority.

11. For a charterer of a vessel to bind an owner though apparent authority, three elements must be satisfied: "first, a representation by the principal to the plaintiff, which, second, causes the plaintiff reasonably to believe that the alleged agent is authorized to act for the principal's benefit, and which, third, induces the plaintiff's detrimental, justifiable reliance upon the appearance of agency." Franza v. Royal Caribbean Cruises, Ltd., 772 F.3d 1225, 1252 (11th Cir. 2014).

12. Pan Ocean did not have apparent authority to bind MUR to the Contract because none of the elements of apparent agency were established.  There is no evidence that MUR represented to WFS that Pan Ocean had the authority to bind it to a contract.  To the contrary, WFS knew that it was contracting with Pan Ocean as all communications were with Pan Ocean, the invoice for the Bunkers was sent to Pan Ocean, and Pan Ocean paid WFS for the VLFSO.

13. The elements of claim for breach of a maritime contract are "(1) a valid contract; (2) a material breach; and (3) damages." F.W.F., Inc. v. Detroit Diesel Corp., 494 F. Supp. 2d 1342, 1360 (S.D. Fla. 2007), aff'd, 308 F. App'x 389 (11th Cir. 2009) (citation omitted).

14. Pan Ocean entered into the Contract with WFS to purchase 500 metric tons of VLSFO bunker fuel meeting specification ISO 8217: 2010 RMG 380 max .5 percent as required

by the Charter Party.  WFS failed to provide bunkers that conformed with these specifications, as the water and sodium exceeded the required specification. WFS breached the Contract.

15. "Maritime contracts must be construed like any other contracts: by their terms and consistent with the intent of the parties." *CITGO Asphalt Ref. Co. v. Frescati Shipping Co.*, 140 S. Ct. 1081, 1087 (2020) (quotations and citations omitted); *accord Detroit Diesel* 494 F. Supp. 2d at 1358 ("[W]hen a maritime contract is unambiguous on its face, the parties' intent must be gathered from the instrument itself without reference to extrinsic evidence."). Accordingly, "[w]here the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent.  In such circumstances, the parties' intent "can be determined from the face of the agreement" and "the language that they used to memorialize [that] agreement." *CITGO,* 140 S. Ct. at 1088 (quotations and citations omitted).

16. "The determination of whether a contract is ambiguous is a question of law for the court. . . however, that maritime contract is not ambiguous merely because one of the parties disputes its proper interpretation." *Detroit Diesel Corp.*, 494 F. Supp. 2d at 1357.

17. The only reasonable interpretation of the Contract's condition to WFS replacing the off-spec bunkers, "cannot be consumed by the [African Wren]",  is that the off-spec bunkers cannot be consumed by the African Wren for any reason. Therefore, because MUR refused to burn the off spec bunkers, the condition has been satisfied.

18. "[A] contact or term thereof is ambiguous if, after applying established rules of interpretation, the written document remains reasonably susceptible to at least two reasonable but conflicting meanings." Id. at 1357-58 (quotation and citation omitted). "When a maritime contract is ambiguous, a factual question is presented to the meaning of its provisions and 'the fact finder

must interpret the contract's terms, in light of the apparent purpose of the contract as a whole, the rules of contract construction, and extrinsic evidence of intent and meaning.'" Id. at 1358.

19. If WFS' interpretation of "cannot be consumed" is determined to be reasonable, it should find the phrase ambiguous because Pan Ocean's interpretation of "cannot be consumed" is also reasonable. *Arriaga v. Fla. Pac. Farms, L.L.C.*, 305 F.3d 1228, 1246 (11th Cir. 2002) ("As both interpretations provide reasonable constructions, the phrase is clearly ambiguous."). If deemed an ambiguous phrase, it must be construed against the drafter. *Id*. ("When 'ambiguity in meaning remains after resort to the ordinary rules of construction,' an ambiguous term is to be construed against the drafter."). Because WFS drafted the GTC, "cannot be consumed" should be construed against WFS by applying Pan Ocean's interpretation of the phrase. The off-spec bunkers could not have been consumed because MUR refused to burn the off-spec bunkers rather than risk damaging its vessel.

20. Alternatively, if the Contract's condition to WFS replacing the off-spec bunkers is ambiguous and the court accepts WFS' interpretation that the condition to replacing the off-spec bunkers is satisfied only if it cannot be consumed without conclusively damaging the African Wren, the condition has still been met because the fuel oil may have had the requisite properties to form an emulsion, which could be harmful to the African Wren.

21. For a limitation to liability clause to be enforceable, "the limitation must not absolve the [service provider] of all liability and must still provide a deterrent to negligence." Diesel "Repower", Inc. v. Islander Invs. Ltd., 271 F.3d 1318, 1324 (11th Cir. 2001).

22. Paragraph 6(g) of the GTC provides that the buyer's remedies are the "replacement of nonconforming Product by the Seller". Pan Ocean demanded that WFS remove the off-spec bunkers from the vessel and refund the payments it made to WFS. WFS refused to do so.

10

23. Because the limitation of liability provision of the Contract requires written consent from WFS for Pan Ocean to be remedied for WFS' breach of contract, WFS has complete control over whether WFS will have liability for its breach. Pan Ocean sought the remedy available under the contract, but WFS refused. Therefore, the Contract's limitation of liability provision is unenforceable as it does not provide any deterrence to WFS' negligence – not even testing the fuel to ensure it conformed to the very specification it contracted to sell.

24. Under general principles of contract law, the mitigation doctrine provides that "[d]amages which the plaintiff might have avoided with reasonable effort without undue risk, expense, burden, or humiliation will be considered either as not having been cased by the defendant's work or as not being chargeable against the defendant." 24 Williston on Contracts § 64:31 (4th ed. 2023); see also Grupo HGM Tecnologias Submarina, S.A. v. Energy Subsea, LLC, 566 F. Supp. 3d 1219, 1235 (S.D. Ala. 2021), aff'd, No. 22-10425, 2023 WL 242546 (11th Cir. Jan. 18, 2023) ("Mitigation is appropriate where a reasonable person, in light of the known facts and circumstances, would have taken steps to avoid damage.")

25. The Contract also imposes a duty to mitigate damages, stating "[Pan Ocean] shall take all available steps (including incurring reasonable costs) and/or cooperating with [WFS], in achieving the most cost-effective solution, including the consumption of the Product, or consumption after treatment, blending and/or special handling."

26. Because Pan Ocean was merely the time charterer of the vessel, Pan Ocean did not have possession or control of the African Wren and, therefore, had no control over whether the African Wren would burn the bunkers. The owner of the African Wren, MUR, was the only entity that had the control to decide what bunkers the African Wren would or would not burn. See also Grand Famous Shipping Ltd. v. Port of Houston Auth., 574 F. Supp. 3d 438, 443 (S.D. Tex. 2021),

aff'd sub nom. Grand Famous Shipping Ltd. v. China Navigation Co. Pte., Ltd., 45 F.4th 799 (5th Cir. 2022) ("Courts are generally reluctant to determine that a time charterer has operational control over a vessel, which would render it an owner *pro hac vice.*").

27. Pan Ocean took all reasonable action to eliminate or minimize damages associated with the off-spec bunkers. Pan Ocean immediately notified WFS of the Off-spec VLSFO and attempted to find a commercial solution with MUR, WFS, and BP. Pan Ocean adopted the recommendations of WFS and BP as its own and repeatedly urged MUR, to burn the bunkers, pursuant to the treatment process outlined by BP and VPS and adopted BP and WFS' arguments in an attempt to urge MUR to follow their recommendations. Despite these best efforts, MUR refused to Burn these bunkers under any circumstance.

28. Pan Ocean fulfilled its contractual requirements and the requirements of imposed by law in attempting to mitigate its damages associated with WFS' failure to provide VLSFO that complied with the contract between the parties.

29. "In Florida, implied waiver of a contractual right requires 'conduct which implies the voluntary and intentional relinquishment of a known right.'" GEICO Marine Ins. Co. v. Shackleford, 945 F.3d 1135, 1142 (11th Cir. 2019). See also Defiance Charters, L.L.C. v. Fla. Yacht Mgmt., LLC, No. 22-CV-62020, 2023 WL 1329921, at *3 (S.D. Fla. Jan. 31, 2023) (quoting Morgan v. Sundance, Inc., 142 S. Ct. 1708, 1713 (2022)) ("Waiver ''is the intentional relinquishment or abandonment of a known right.'").

30. Because Pan Ocean's senior manager's email from July 15, 2022 advised WFS that the bunkers did not meet the specifications of the confirmation and it specifically stated Pan Ocean's intention to not waive this claim, stating "without prejudice. . . Pan Ocean reserves the right to make a claim against World Fuel Services for the amount of a loss and all the consequences

arising from the alleged off-spec bunker", Pan Ocean did not waive its claim against WFS for the off-spec bunkers.

31.    Pan Ocean did not waive this claim because suit was filed within 6 months of the date of delivery of the bunkers after all attempts to commercially resolved the issues were unsuccessful.

32.    The reasonable value of the damages from WFS breach of contract are: (1) the difference between the sums received for the bunkers and the sums which would have been received by Pan Ocean for the bunkers had WFS supplied contractual VLSFO; (2) the lost hire/expense incurred during the debunkering operation; and (3) the disbursements incurred at Malta for the purposes of debunkering.

## **CONCLUSION**

Taking into consideration all of the above, the Court directs the Clerk to enter judgment in favor of Plaintiff, Pan Ocean, and against, WFS. Pan Ocean shall file any motion for attorney's fees and costs within the time required by the Local and Federal Rules.

Respectfully submitted,

 /s/ Eric C. Thiel_____
Eric C. Thiel, Esquire
Florida Bar No.: 016267
BANKER LOPEZ GASSLER P.A.
501 E. Kennedy Boulevard
Suite 1700
Tampa, FL 33602
Telephone: (813) 221-1500
Facsimile:  (813) 222-3066
Service-Ethiel@bankerlopez.com
Attorneys for Plaintiff

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 12, 2023, I electronically filed the foregoing with the Clerk of the Court by using CM/ECF system which will send a notice of electronic filing to all counsel of record.

   /s/ Eric C. Thiel
Eric C. Thiel