UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-20014-CIV-ALTONAGA/Damian

**PAN OCEAN CO., LTD.**,

 Plaintiff,
v.

**WORLD FUEL SERVICES (SINGAPORE) PTE, LTD.**,

 Defendant.
_____/

### ORDER

**THIS CAUSE** came before the Court upon the parties' cross motions for summary judgment. On November 7, 2023, Plaintiff, Pan Ocean Co., Ltd., filed a Motion for Partial Summary Judgment [ECF No. 57]. The same day, Defendant, World Fuel Services (Singapore) Pte., Ltd., filed its Motion for Final Summary Judgment [ECF No. 59]. The parties filed their respective Responses [ECF Nos. 63 & 64], followed by Replies [ECF Nos. 66 & 67]. Upon review of the parties' written submissions,[1] the record, and applicable law, Plaintiff's Motion is denied, and Defendant's Motion is granted in part and denied in part.

### I. BACKGROUND

Plaintiff is a large global shipping company that operates approximately 300 commercial

---

[1] The parties' factual submissions include Plaintiff's Statement of Material Facts in Accordance with Local Rule 56.1 ("Plaintiff's SOF") [ECF No. 58] and supporting exhibits (*see* Pl.'s Notice of Filing [ECF No. 56]); Defendant's Statement of Material Facts in Opposition to Plaintiff's Statement of Material Facts ("Response to Plaintiff's SOF") [ECF No. 65]; Defendant's Statement of Material Facts in Support of Defendant's Motion for Summary Judgment ("Defendant's SOF") [ECF No. 60] and supporting exhibits; Plaintiff's Statement of Material Facts in Opposition to World Fuel Services Statement of Material Facts ("Response to Defendant's SOF") [ECF No. 62] and supporting exhibits (*see* Pl.'s Second Notice of Filing [ECF No. 61]); and Defendant's Reply Statement of Materials Facts in Support of Defendant's Motion Summary Judgment ("Reply to Defendant's SOF") [ECF No. 68] and supporting exhibits.

ships and regularly purchases marine fuel oil from a variety of suppliers. (*See* Def.'s SOF ¶¶ 1–2; Resp. Def.'s SOF ¶¶ 1–2). Defendant is one such supplier, and the parties have a "longstanding business relationship" encompassing 586 transactions "in the last two years, both prior to and after the filing of this lawsuit." (Def.'s SOF ¶¶ 13–14; *see* Resp. Def's SOF ¶¶ 13–14).

The parties' business relationship is governed by a master contract that incorporates the World Fuel Services Marine Group of Companies General Terms and Conditions ("GT&C"). (*See* Def.'s SOF ¶¶ 15–16; Resp. Def's SOF ¶¶ 15–16; Compl. [ECF No. 1], Ex. 1, GT&C [ECF No. 1-1]). Paragraph 6(g) of the GT&C provides that:

> It is the duty of Buyer to take all reasonable actions to eliminate or minimize any damages or costs associated with any off-specification or suspected off-specification Products. To this end, Buyer shall take all available steps (including incurring reasonable costs) and/or cooperating with Seller, in achieving the most cost-effective solution, including the consumption of the Product, or consumption after treatment, blending and/or special handling. In the event that the Product is off-specification and cannot be consumed by the Receiving Vessel, Buyer's remedies shall be limited exclusively and solely to the replacement of the nonconforming Product by the Seller. If Buyer removes the Product from the Receiving Vessel without the express written consent of Seller, then all such removal and related costs shall be solely for Buyer's account. In any event, Seller's liability for any claims, whether arising from quality, quantity, accident, delay, spill or any other cause whatsoever either in contract or tort (including negligence) or at law, shall not exceed the price of that portion of the Products sold on which liability is asserted. Furthermore, neither the Seller nor its physical supplier shall have any liability to the Buyer under or in connection with any transaction for (1) any demurrage, offhire or other vessel delay or (2) loss of actual or anticipated profit or (3) losses caused by business interruption or (4) loss of goodwill or reputation or (5) for indirect, special, incidental, exemplary, punitive or consequential damages whether or not for[e]seeable, including, but not limited to, damages arising from the exercise of Seller's right to suspend and/or terminate delivery of Products.

(GT&C 4 (emphasis omitted; alteration added)).[2]

In July 2022, Plaintiff purchased 500 metric tons of "Very Low Sulphur Fuel Oil" from

---

[2] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings. Citations to deposition testimony rely on the pagination and line numbering in the original document.

Defendant for use by the maritime vessel African Wren, which Plaintiff had chartered from non-party MUR Shipping BV ("MUR"). (Def.'s SOF ¶¶ 3, 7; *see* Resp. Def's SOF ¶¶ 3, 7). According to the purchase contract, the fuel was to meet "specification 'ISO 8217: 2010 RMG 380 max .5 percent.'" (Pl.'s SOF ¶ 6; *see* Resp. Pl.'s SOF ¶ 6). Non-party BP Pte. Singapore Limited ("BP") delivered the fuel to the vessel in Singapore on July 9, 2022. (*See* Def.'s SOF ¶ 26; Resp. Def.'s SOF ¶ 26).

After the delivery, non-party Veritas Petroleum Services BV ("VPS") tested a sample of the fuel. (*See* Def.'s SOF ¶ 27; Resp. Def.'s SOF ¶ 27). VPS produced two reports indicating the sample exceeded the water and sodium specifications for fuel classified under ISO 8217: 2010 RMG 380. (*See* Def.'s SOF ¶¶ 28–29; Resp. Def.'s SOF ¶¶ 28–29). In the reports, VPS noted that "[t]he sodium to water ratio suggest[ed] the water is probably saline" and provided operational advice on how to treat the fuel prior to use. (Def.'s SOF ¶ 32 (alterations added); *see* Resp. Def.'s SOF ¶ 32).

MUR sent the VPS reports to Plaintiff, who then informed Defendant that the fuel was off-specification. (*See* Def.'s SOF ¶¶ 33–34; Resp. Def.'s SOF ¶¶ 33–34). In compliance with the GT&C, BP conducted its own testing and also found that the fuel presented elevated levels of water and sodium. (*See* Def.'s SOF ¶¶ 35–37; Resp. Def.'s SOF ¶¶ 35–37). Defendant sent Plaintiff the test results commissioned by BP, as well as recommendations from Defendant's technical team and BP on how to treat the fuel prior to consumption. (*See* Def.'s SOF ¶ 38; Resp. Def.'s SOF ¶ 38).

Plaintiff relayed these materials to MUR (*see* Def.'s SOF ¶ 39; Resp. Def.'s SOF ¶ 39); MUR resisted treating and consuming the fuel without additional testing, which BP refused to conduct (*see* Pl.'s SOF ¶ 16; Resp. Pl.'s SOF ¶ 16; Pl.'s Notice of Filing, Ex. 3, Guerra Dep. [ECF

No. 56-3] 44:20–47:9; Pl.'s Notice of Filing, Ex. 14, Composite of Emails [ECF No. 56-14] 15–16, 19). Plaintiff repeatedly urged MUR to treat and consume the fuel. (*See* Def.'s SOF ¶¶ 41–44; Resp. Def.'s SOF ¶¶ 41–44). For example, in an August 23, 2022 message, Plaintiff advised MUR the fuel was "capable of being safely consumed" and provided instructions on how to do so. (Def.'s SOF, Ex. 6, Attachments to Kim Dep. [ECF No. 60-6] 13–15). And in an August 29, 2022 email to MUR, Plaintiff characterized MUR's unwillingness to burn the fuel "despite all the evidence that it would be safe to do so" as "unreasonabl[e]" and reiterated Plaintiff's position that the fuel was "safe to consume" and de-bunkering — that is, removal of the fuel from the vessel — was "unnecessary[.]" (*Id.* 9–10 (alterations added)).

MUR refused and instead "demanded de-bunkering." (Pl.'s SOF ¶ 19; *see* Resp. Pl.'s SOF ¶ 19). Plaintiff requested that Defendant de-bunker and replace the fuel, but Defendant refused to do so because it considered the fuel consumable. (*See* Def.'s SOF ¶¶ 52–53; Pl.'s SOF ¶ 20). According to Plaintiff, "MUR arranged for the de[-]bunkering of the off-specification fuel" itself, (Pl.'s SOF ¶ 21 (alteration added)), resulting in total damages of $490,575.53 (*see* Compl. ¶ 34).

Plaintiff filed a one-count Complaint alleging breach of contract to recover damages resulting from Defendant's failure to provide the fuel as specified. (*See generally* Compl.). Defendant filed a Motion to Dismiss Complaint with Prejudice [ECF No. 21], which the Court denied. *See generally Pan Ocean Co., LTD v. World Fuel Servs. (Singapore) PTE, LTD.*, No. 23-20014-Civ, 2023 WL 4846606 (S.D. Fla. July 28, 2023). Both parties now seek summary judgment. (*See generally* Pl.'s Mot.; Def.'s Mot.). According to Defendant, Plaintiff's claim fails because no remedy is available under the contract. (*See generally* Def.'s Mot.; Def.'s Resp.; Def.'s Reply). According to Plaintiff, there is no genuine dispute regarding Defendant's liability or the availability of a remedy under the contract, and only the issue of damages should proceed to trial.

4

(*See generally* Pl.'s Mot.; Pl.'s Resp.; Pl.'s Reply).

## II. LEGAL STANDARD

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (citations omitted). Relatedly, motions for partial summary judgment serve the purpose of "expediting trials by narrowing legal issues and establishing facts not in controversy." *Brown v. Crawford Cnty.*, 960 F.2d 1002, 1007 n.6 (11th Cir. 1992) (citations omitted); *see also* Fed. R. Civ. P. 56(a) (permitting motions for summary judgment on a "part of each claim or defense"). "The same standard that applies to full motions for summary judgment applies to motions for partial summary judgment." *Bonds v. Hyundai Motor Co.*, No. 14-cv-330, 2019 WL 1244711, at *1 (M.D. Ala. Mar. 18, 2019).

A federal court must grant summary judgment if the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a), (c). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if the evidence could lead a reasonable jury to find for the nonmoving party. *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient[.]" *Anderson*, 477 U.S. at 252 (alterations added). Further, "[a] party opposing summary judgment may not rest upon the mere allegations or denials in its pleadings." *Walker v. Darby*, 911 F.2d 1573, 1576–77 (11th Cir. 1990) (alteration added).

5

If the moving party bears the burden of proof on the relevant issue at trial, it can meet its summary judgment burden only "by presenting *affirmative* evidence showing the absence of a genuine issue of material fact — that is, facts that would entitle it to a directed verdict if not controverted at trial." *Emery v. Talladega Coll.*, 169 F. Supp. 3d 1271, 1280–81 (N.D. Ala. 2016) (emphasis in original; citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993)). If the moving party does not bear the burden of proof on the relevant issue at trial, it need only show "that there is an absence of evidence to support the non-moving party's case." *Fitzpatrick*, 2 F.3d at 1116 (citation omitted).

Once the movant discharges its initial burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quotation marks and footnote call number omitted). To make that showing, the non-moving party "must cite to . . . materials in the record or show that the materials cited do not establish the absence or presence of a genuine dispute." *Blackhawk Yachting, LLC v. Tognum Am., Inc.*, No. 12-14208-Civ, 2015 WL 11176299, at *2 (S.D. Fla. June 30, 2015) (alteration added; quotation marks omitted; citing Fed. R. Civ. P. 56(c)(1)).

Courts must draw all reasonable inferences in favor of the party opposing summary judgment. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000). "Summary judgment may be inappropriate even where the parties agree on the basic facts[] but disagree about the inferences that should be drawn from these facts." *Whelan v. Royal Caribbean Cruises Ltd.*, No. 12-cv-22481, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (alteration added; citation omitted). Indeed, "[i]f reasonable minds might differ on the inferences arising from undisputed facts, then the Court should deny summary judgment" and proceed to trial. *Id.* (alteration added; citations omitted). Finally, in considering cross-motions for summary judgment, the court views

the facts in the light most favorable to the non-moving party on each motion. *See Chavez v. Mercantil Commercebank, N.A.*, 701 F.3d 896, 899 (11th Cir. 2012) (citations omitted).

### III. DISCUSSION

As noted, paragraph 6(g) of the GT&C directly addresses the delivery of nonconforming fuel. (*See* GT&C 4). While the parties do not dispute Defendant delivered off-specification fuel, they disagree about whether Plaintiff is entitled to any remedies under the contract. (*See generally* Def.'s Mot.; Pl.'s Mot.). Specifically, the parties dispute whether 1) paragraph 6(g)'s limitation of liability clause is enforceable; 2) the phrase "cannot be consumed" applies to these facts; and 3) Plaintiff fulfilled its duty to mitigate damages. The Court addresses each of the parties' arguments.

**A. Limitation of Liability Clause**

Paragraph 6(g) of the GT&C limits Defendant's liability for off-specification fuel that cannot be consumed to "the replacement of nonconforming Product[.]" (GT&C 4 (alteration added)). "If Buyer removes the Product from the Receiving Vessel without the express written consent of Seller, then all such removal and related costs" fall on the Buyer; and "in any event, seller's liability for any claims . . . shall not exceed the price of that portion of the Products sold on which liability is asserted." (*Id.* (emphasis omitted; alteration added)). Further, the GT&C expressly precludes Defendant's liability for certain categories of damages, such as lost profits. (*See id.*).

According to Plaintiff, the limitation of liability provision is unenforceable because, by requiring Defendant's written consent for removal of off-specification fuel, the provision gives Defendant "complete control over whether [Defendant] will have liability for" providing nonconforming fuel in the first place. (Pl.'s Mot. 12 (alteration added)). Defendant maintains the provision is an enforceable representation of the parties' agreed-upon bargain. (*See* Def.'s Mot.

13–14). Each party seeks summary judgment in its favor on this issue. (*See id.*; Pl.'s Mot. 11–12).

To be enforceable, a limited liability clause must meet three requirements: (1) it "must clearly and unequivocally indicate the parties' intention[;]" (2) "the limitation must not absolve [a party] of all liability and must still provide a deterrent to negligence[;]" and (3) "the parties must be of equal bargaining power to prevent overreaching." *Diesel "Repower", Inc. v. Islander Invs. Ltd.*, 271 F.3d 1318, 1324 (11th Cir. 2001) (alterations added; citations omitted). These conditions are met here.

First, the parties do not dispute that the provision "clearly and unequivocally indicate[s] the parties' intention[.]" *Id.* (alterations added; citation omitted); (*see* Pl.'s Mot 11–12; Pl.'s Resp. 5; Def.'s Mot. 13). Indeed, the language limiting liability clearly states specific liability exclusions and restricts Defendant's liability to the replacement of the fuel or the price of fuel sold, subject to specific conditions. (*See* GT&C 4).

Second, the GT&C's limitations do not absolve Defendant of all liability. Typically, the second *Diesel "Repower"* factor is a "fact-specific inquiry[.]" 271 F.3d at 1325 (alteration added). But Plaintiff's sole argument is about contract interpretation: it argues the provision is unenforceable because Defendant's written permission to de-bunker is required for *any* liability to attach to Defendant. (*See* Pl.'s Mot. 12; Pl.'s Resp. 6–7). Not so.

"Under federal maritime law, contract interpretation begins with the plain meaning of the contract terms." *Baer v. Silversea Cruises Ltd.*, 752 F. App'x 861, 866 (11th Cir. 2018) (citation omitted). The clear language of the provision excludes only "removal and related costs" when removal of the fuel is carried out without Defendant's written permission. (GT&C 4). Thus, even if unauthorized removal occurred, Defendant would still be potentially liable for "replacement of

8

the nonconforming Product" — not to exceed the sale price of the fuel — if the fuel was off-specification and could not be consumed. (*Id.*; *see also* Def.'s Resp. 9). Here, where the original fuel purchase exceeded half a million dollars, Defendant is potentially liable for up to that amount. (*See* Guerra Dep. 29:14–25). Clearly, then, the provision does not absolve Defendant of all liability, and the cost of replacement provides sufficient deterrence to negligence. *See Merrill Stevens Dry Dock Co. v. M/V YEOCOMICO II*, 329 F.3d 809, 813–14 (11th Cir. 2003) (noting "risk of liability for as little as $300,000 is a sufficient deterrent of negligence" (citation and footnote call number omitted)).

Third, and finally, Plaintiff makes a half-hearted argument that the parties have unequal bargaining power because Defendant "and other [fuel] suppliers refuse to negotiate their GT[&]Cs even with large shipping [companies] such as" Plaintiff. (Pl.'s Resp. 5–6 (alterations added)). Plaintiff cites no legal authority for this proposition, provides no evidence that it ever attempted to negotiate a change to the limitation of liability clause, and does not argue it was otherwise coerced into entering the contract. (*See generally* Pl.'s Mot.; Pl.'s Resp.; Pl.'s Reply; Pl.'s SOF).

By contrast, Defendant emphasizes both parties are large, established, and sophisticated commercial entities who have repeatedly transacted with each other, both prior to and after the events giving rise to this litigation. (*See* Def.'s Mot. 14). As Defendant points out, courts have found that such sophisticated parties are "free to allocate risks between themselves, as well as [to] disclaim and limit liabilities." (*Id.* (alteration added; citing *Merrill Stevens Dry Dock Co.*, 329 F.3d at 813–14 & n.4 (rejecting the argument that parties had unequal bargaining power where the party challenging clause's enforceability was in business for over 40 years and previously signed similar contracts); *Korea Line Corp. v. World Fuel Servs. Corp.*, No. 14-cv-20122, Order [ECF No. 41] 6–7, filed June 30, 2015 (S.D. Fla. 2017) (finding plaintiff's suggestion of a "general"

9

bargaining power disparity insufficient where there was no evidence of overreaching, and the plaintiff was a sophisticated party in business for nearly 50 years that regularly purchased fuel from the defendant); other citations omitted)). Finding no evidence of overreaching by Defendant in the record, the Court determines the limitation of liability clause is enforceable, and summary judgment in favor of Defendant on this issue is appropriate.

Because the limitations in paragraph 6(g) are enforceable, it follows that Plaintiff cannot recover certain types of damages. Given the Court determines this case should proceed to trial, the Court reserves judgment on which specific damages are available to Plaintiff.

### B. "Cannot Be Consumed"

The parties both acknowledge that Plaintiff may recover damages for non-conforming fuel if the fuel is "off-specification and cannot be consumed by the Receiving Vessel[.]" (GT&C 4 (alteration added); *see also* Def.'s Mot. 9–10; Pl.'s Mot. 12–15). The parties also acknowledge that the fuel was off-specification. (*See* Def.'s SOF ¶¶ 29–30, 36–37; Pl.'s SOF ¶ 10). But the parties dispute the meaning of the phrase "cannot be consumed" and whether this condition was in fact met. (*See* Def.'s Mot. 6–10; Def.'s Resp. 5–8; Pl.'s Mot. 13–15; Pl.'s Resp. 1–4).

1. Contract Interpretation

The Court first addresses the proper interpretation of the contract provision. According to Plaintiff, the phrase "cannot be consumed" "does not specify a reason for why the [fuel] cannot be consumed" and therefore allows for "any reason." (Pl.'s Mot. 14 (alterations added); Pl.'s Resp. 2 ("The GT[&]C does not specify why the [fuel] cannot be consumed[.]" (alterations added))). In other words, Plaintiff believes it is "entitled to damages" simply because "MUR's refusal resulted in the [fuel] not being able to be consumed[.]" (Pl.'s Mot. 15 (alterations added)). Defendant argues this interpretation is contrary to the plain language of the provision, renders other language

10

in the contract meaningless, and impermissibly converts an "objective standard" into an "arbitrary" and "subjective standard determined by the whims of a ship owner who . . . is not a party to the purchase." (Def.'s Resp. 6–7 (alteration added); *see also* Def.'s Reply 2).

"Maritime contracts 'must be construed like any other contracts: by their terms and consistent with the intent of the parties.'" *CITGO Asphalt Refin. Co. v. Frescati Shipping Co., Ltd.*, 140 S. Ct. 1081, 1087 (2020) (quoting *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 31 (2004); other citation omitted). This includes adopting a written contract's "'plainly expressed intent'" where the language of the contract is "'clear and unambiguous[.]'" *Id.* at 1088 (alteration added; quoting *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015)). Here, the plain language of the contract does not support Plaintiff's interpretation.

Plaintiff's interpretation of the phrase "cannot be consumed" would encompass a vessel's refusal to consume fuel for any reason, allowing Plaintiff to recover from Defendant if the vessel simply changed its mind about a purchase. But as Defendant points out, "cannot" means "unable[,] not unwilling." (Def.'s Resp. 6 (alteration added; citing *Cannot*, MERRIAM-WEBSTER, http://www.merriam-webster.com/dictionary/cannot (last visited Jan. 12, 2024) (defining "cannot" as "to be unable to do otherwise than"))). Plaintiff's interpretation is thus irreconcilable with the contract's plain language, which requires more than mere refusal.

Nonetheless, Plaintiff is correct that the contract does not specify what circumstances would render a vessel incapable of consuming off-specification fuel. (*See* Pl.'s Mot. 14; GT&C 4). Defendant asserts the provision establishes an "objective standard of 'consumable'" but fails to articulate what that means. (Def.'s Resp. 7). Defendant's reference to neighboring language is similarly unhelpful. (*See id.* 6–7). Under the contract, the buyer is required to "take all available steps . . . in achieving the most cost-effective solution, including the consumption of the Product,

11

or consumption after treatment, blending and/or special handling." (GT&C 4 (alteration added)). According to Defendant, "[a] determination that fuel oil 'cannot be consumed' therefore necessarily follows attempted consumption before or after treatment." (Def.'s Resp. 7 (alteration added)). But this does not explain how to determine whether the fuel is consumable either before or after treatment. Nor does it explain who makes the ultimate determination of whether fuel is consumable.

These open questions render the phrase "cannot be consumed" ambiguous. "When a written contract is ambiguous, its meaning is a question of fact, requiring a determination of the intent of the parties in entering the contract; that may involve examining relevant extrinsic evidence of the parties' intent and the meaning of the words that they used." *CITGO Asphalt Refin. Co.*, 140 S. Ct. at 1088 (alteration omitted; other alterations adopted; quotation marks and citation omitted). Therefore, the Court does not definitively answer what the exact contours of the contract term are. What "cannot be consumed" means will have to await factual determinations at trial.

Regardless of these outstanding issues, the parties' remaining arguments proceed from the common-sense assumption that whether fuel is "consumable" is related to whether it is "safe" for the vessel's machinery. (*See* Pl.'s Resp. 3 (contemplating the Court may interpret the phrase to mean "cannot be consumed without damaging the [receiving vessel]" and making corresponding arguments (alteration added)); Def.'s Mot. 6–7 (arguing Plaintiff conceded the fuel was consumable when it "agreed that the fuel oil could be safely consumed")). While not foreclosing other interpretations, the Court agrees damage to a vessel's machinery — which might render the vessel incapable of consuming the fuel — is consistent with the phrase "cannot be consumed." Thus, for the purposes of evaluating the parties' remaining arguments, the Court adopts the

12

interpretation that whether fuel is "consumable" is related to whether its consumption would damage a receiving vessel's machinery.

2. Damage to Vessel

Whether the fuel was consumable is a condition of the contract. (*See* GT&C 4). Thus, to establish Defendant's breach, Plaintiff bears the burden at trial of proving the fuel could not be consumed. *Cornett v. Lender Processing Servs., Inc.*, No. 12-cv-233, 2013 WL 4780065, at *6 (M.D. Fla. Sept. 5, 2013) (explaining that the plaintiff's burden included showing that "all conditions required by the contract for [the defendant's] performance had occurred" (alteration added; citing *Escarra v. Regions Bank*, 353 F. App'x 401, 402 (11th Cir. 2009); other citation omitted)).

To prevail on summary judgment, Plaintiff must therefore present evidence affirmatively showing there is no dispute that the fuel could not be consumed without damaging the vessel. *Fitzpatrick*, 2 F.3d at 1115. But Plaintiff's Motion can be disposed of quickly, as Plaintiff does not even attempt to make that affirmative showing; rather, Plaintiff's Motion hinges entirely on the contract interpretation the Court rejects. (*See generally* Pl.'s Mot.). Consequently, Plaintiff's Motion must be denied.

Defendant also fails to meet its burden on this issue, as the Court now explains. Defendant argues the fuel was consumable with appropriate treatment, and treatment of fuel by receiving vessels is a common practice among commercial vessels. (*See* Def.'s Mot. 6–7; Def.'s SOF ¶¶ 9–12, 30–32, 38). Defendant emphasizes that Plaintiff repeatedly requested MUR treat and consume the fuel and asserts Plaintiff itself "admit[ted] that the fuel oil could have been consumed[.]" (Def.'s Mot. 10 (alterations added); *see also* Def.'s SOF ¶¶ 41–44; Resp. Def.'s SOF ¶¶ 41–44).

13

Therefore — according to Defendant — no genuine dispute of fact exists, and summary judgment in its favor is appropriate. (*See* Def.'s Mot. 9–10).

Plaintiff admits it sent emails to MUR stating the fuel was safe for consumption after treatment and encouraged MUR to treat and consume the fuel, but it argues these communications are inadmissible as settlement communications under Federal Rule of Evidence 408. (*See* Pl.'s Resp. 3–4). Plaintiff also points to its expert's opinion, who testified during his deposition that based on the VPS and BP test results, the fuel oil and water may have emulsified. (*See* Pl.'s Second Notice of Filing, Ex. 1, de Jager Dep. [ECF No. 61-1] 73:5–14). Emulsification would have made the fuel treatment suggested by Defendant ineffective to change the composition of the fuel. (*See id.* 75:4–78:10). Plaintiff asserts there is therefore "an issue of fact as to whether the off-spec fuel could have been burned without damaging the vessel[,]" regardless of whether Defendant's recommended treatment had been undertaken. (Pl.'s Resp. 3 (alteration added)). The Court first considers the evidentiary question and then addresses the underlying factual dispute.

At summary judgment, courts may consider only evidence reducible to an admissible form at trial. *See Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005); Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). "Federal Rule of Evidence 408(a) excludes evidence of settlement negotiations when offered to prove 'liability for, invalidity of, or amount of a claim that was disputed as to validity or amount' or when offered for certain impeachment purposes." *Fisk Elec. Co. v. Solo Constr. Corp.*, 417 F. App'x 898, 902 (11th Cir. 2011) (quoting Fed. R. Evid. 408(a)). Rule 408(b) allows introduction of such evidence for other purposes. *See* Fed. R. Evid. 408(b). "[T]he test for admissibility under Rule 408 is whether the communication or conduct at issue was intended to be a part of the negotiations toward compromise." *Equal Emp.*

14

*Opportunity Comm'n v. St. Joseph's/Candler Health Sys., Inc.*, No. 420-cv-112, 2022 WL 17978822, at *4 (S.D. Ga. Dec. 28, 2022) (alteration added; quotations marks omitted; quoting *Blu–J, Inc. v. Kemper C.P.A. Grp.*, 916 F.2d 637, 642 (11th Cir. 1990)).

The parties insufficiently brief whether the email communications between Plaintiff and MUR are admissible, providing scant legal authority and little information about the context in which the emails were sent. (*See* Pl.'s Resp. 3–4; Def.'s Reply 3–4). Plaintiff simply asserts the communications were sent "while it negotiated with MUR, [Defendant], and BP to resolve this claim[.]" (Pl.'s Resp. 4 (alterations added)). And while Defendant argues the emails are just "demand emails" containing "no admission of liability[,]" Defendant does not adequately address other issues relevant to a Rule 408 analysis, such as whether Defendant seeks to introduce the messages to invalidate Plaintiff's claim or whether the messages represent a compromise negotiation. (Def.'s Reply 3 (alteration added)). *Compare Coquina Invs. v. Rothstein*, No. 10-60786-Civ, 2012 WL 4479057, at *18 (S.D. Fla. Sept. 28, 2012) (excluding a demand letter under Rule 408 because it constituted an offer of compromise), *aff'd sub nom. Coquina Invs. v. TD Bank, N.A.*, 760 F.3d 1300 (11th Cir. 2014) *with Utah Reverse Exch., LLC v. Donado*, No. 14-0408-Civ, 2015 WL 419874, at *1 (S.D. Ala. Feb. 2, 2015) (finding demand letter "f[ell] outside Rule 408" where "defendants presented their demand for the full amount they claim[ed] [was] owed them" (alterations added; footnote call number omitted)).[3]

The Court does not need to decide this evidentiary issue at this point. Even if the emails are admissible, Defendant fails to establish the absence of a factual dispute as to whether the fuel was consumable without damage to the vessel. True, Plaintiff told MUR the fuel was "safe to

---

[3] Defendant also briefly argues Plaintiff waived protection under Rule 408 by producing the messages in discovery, failing to object to them during its corporate representative's deposition, and seeking to introduce them as evidence of Plaintiff's compliance with other contractual provisions. (*See* Def.'s Reply 4). Because the Court does not need to resolve the evidentiary issue here, it does not reach these arguments either.

15

consume and [] de-bunkering [was] unnecessary[.]" (Attachments to Kim Dep. 10 (alterations added)). Plaintiff still maintains the fuel could have been burned, although during his deposition, its corporate representative fell short of confirming that doing so would have been "safe." (*See* Def.'s SOF, Ex. 1, Kim Dep. [ECF No. 60-1] 180:8–185:2 (repeatedly stating the fuel could have been used but that doing so represented "risks")).

Here, MUR ostensibly decided the risk of damage to its machinery was unacceptable without further testing (*see* Composite of Emails 15 (demanding full test of specification parameters); *see also id.* 19 (noting unsuitable fuel could cause damage to the vessel's engines); Pl.'s Mot. 14 (stating MUR refused to burn the fuel "due to the risk of its machinery being damaged")); and Plaintiff's proffered expert suggests this stance might have been reasonable (*see generally* de Jager Dep.). Defendant, of course, disagrees, insisting the fuel would have been consumed after treatment. (*See* Def.'s Mot. 6–7). This conflicting evidence constitutes a genuine dispute of fact that precludes summary judgment.

Further, "even in the absence of a factual dispute, a district court has the power to deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial." *Lind v. United Parcel Serv., Inc.*, 254 F.3d 1281, 1285 (11th Cir. 2001) (citations and quotation marks omitted)). On these issues, the Court has reason to "believe[] the case would benefit from a full hearing." *United States v. Certain Real & Pers. Prop. Belonging to Hayes*, 943 F.2d 1292, 1297 (11th Cir. 1991) (alteration added; citation omitted).

**C. Mitigation**

Finally, the parties dispute whether Plaintiff adequately mitigated damages as required by the contract. (*See* GT&C 4). According to Plaintiff, its efforts to convince MUR to treat and consume the nonconforming fuel properly discharged its duties under the GT&C "to take all

16

reasonable actions to eliminate or minimize any damages or costs associated with any off-specification . . . Products." (GT&C 4 (alteration added); *see also* Pl.'s Mot. 6–11). Defendant argues Plaintiff failed to take all available steps because it ultimately acquiesced to MUR's de-bunkering, failed to properly oversee the de-bunkering, and did not attempt to use the fuel in "one of its approximately 20 commercial ships similar in size" to MUR's vessel. (Def.'s Resp. 10; *see also* Def.'s Mot. 14–16).

As the Court noted at the motion-to-dismiss stage, "[t]o apply the parties' mitigation clause, the factfinder would have to conduct a 'reasonable efforts' analysis." *Pan Ocean Co., LTD*, 2023 WL 4846606, at *3 (alteration added). Such an analysis involves factual determinations most appropriate for trial. *See, e.g.*, *Thomas v. W. World Ins. Co.*, 343 So. 2d 1298, 1303 (Fla. 2d DCA 1977) (reversing grant of summary judgment where reasonableness of mitigation efforts "depend[ed] upon all relevant facts" and "circumstances" (alteration added)).[4]

### IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment [ECF No. 59] is **GRANTED in part and DENIED in part**. Plaintiff's Motion for Partial Summary Judgment [ECF No. 57] is **DENIED**.

---

[4] "In the absence of well-developed maritime law on a particular issue, the court may rely on federal common law or state law to supplement maritime law so long as it does not alter or overrule maritime law in so doing." *Sutton v. Royal Caribbean Cruises Ltd.*, 774 F. App'x 508, 513 n.7 (11th Cir. 2019) (citation omitted). Moreover, the parties have contracted for the application of Florida law where general maritime law is "silent on the disputed issue[.]" (GT&C 15 (alteration added)). The Court could find no well-developed federal maritime law on the issue of mitigation.

**DONE AND ORDERED** in Miami, Florida, this 19th day of January, 2024.

_____
**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:   counsel of record